## MINNEAPOLIS GAS COMPANY v. SYDNEY M. DAHLE AND OTHERS.

171 N. W. (2d) 813.

November 7, 1969—No. 41916.

*Cloutier, Gallagher, White & James,* and *Thomas Gallagher,* for appellants.

*Mastor, Mattson, Lindstrom, Hart & Seran, Wayne H. Olson,* and *Jeffrey H. Hartje,* for respondent.

Heard before Knutson, C. J., and Otis, Rogosheske, Sheran, and Peterson, JJ.

OTIS, JUSTICE.

The petitioner, Minneapolis Gas Company, has condemned an easement for a storage reservoir of natural gas underlying 8,400 acres of farmland in Waseca, Le Sueur, and Rice Counties. Three of the affected property owners, Sydney M. Dahle, Otto Jellum, and Selma Jellum, have been granted leave under Rule 105, Rules of Civil Appellate Procedure, to appeal from the order of the trial court granting the petition for an easement and appointing commissioners to assess damages.

The issue in this court has been narrowed to the question of whether Minn. St. 222.36 and 300.04[1] authorize the gas company to condemn an easement only, or whether there is such a substantial risk of danger from escaping gas that the statute must be construed to require the public service corporation to condemn the entire fee.

Minn. St. 84.57 to 84.621, as amended by L. 1969, cc. 723 and 724, prescribe the procedure for securing from the commissioner of conservation a permit for underground storage of natural gas. Section 84.60 provides in part as follows:

"No order granting a permit for the proposed storage shall be issued unless it shall contain and be based on the following findings:

"(1) The proposed storage will be confined to geological stratum or strata lying more than 500 feet below the surface of the soil;

---

[1] Under Minn. St. 222.36, "[a]ny public service corporation shall have the right to obtain by condemnation, under the right of eminent domain, any land, or any right over, through, or across the same, or any easement therein, necessary for the convenient prosecution of its enterprise * * *."

Under Minn. St. 300.04, every public service corporation "* * * may acquire by right of eminent domain such private property as may be necessary or convenient for the transaction of the public business for which it was formed."

"(2) The proposed storage will not substantially impair or pollute any water resources;

"(3) That the public convenience and necessity of a substantial portion of the gas consuming public in the state will be served by such undertaking * * *."

Pursuant to statute, Minneapolis Gas Company was granted a hearing in September 1967 and in June 1968 on its petition to secure a permit for gas storage, notice of which was given to all affected property owners. The commissioner's findings may be summarized as follows:

In December 1966, the gas company served 243,560 customers of whom 219,674 used natural gas for heating purposes. Gas is purchased from Northern Natural Gas Company primarily for residential space heating, little or none of which is required during the summer. The purpose of a storage facility would be to permit the purchase of gas during the summer for use in the winter when the demand is high, thereby effecting a saving which would be passed on to consumers. The commissioner found: "The public convenience and necessity of a substantial portion of the gas-consuming public in the state will be served by the proposed project." The company's proposal was to store gas underground by injecting gas under pressure and displacing water in the Mount Simon sandstone underlying 8,400 acres in Waseca, Le Sueur, and Rice Counties. The commissioner enumerated three requisites for such a purpose:[2]

(a) The storage area must be a geologic trap capable of confining the lateral movement of gas to an area within the reservoir.

(b) The storage reservoir must consist of a layer of sandstone or other porous water-bearing rock of sufficient thickness and porosity, and permeable enough, to permit gas to be injected and withdrawn. "The storage reservoir must also be far enough

_____

[2] See, Litz, *Underground Storage of Natural Gas in the Appalachian Area,* 68 W. Va. L. Rev. 138.

below the land surface to make safe the storage of gas at the pressures required."

(c) There must be an impermeable cap rock above the storage reservoir to prevent the leakage of gas to the surface.

The commissioner went on to find that there was a geologic structure in the form of an asymmetric anticline 5 miles long and 2 miles wide, located 750 feet below the land surface and consisting primarily of sandstone. The proposed storage area was capable of containing 34 billion cubic feet of gas.

Appellants cite the following finding in support of their claim that the proposal involves a substantial risk of danger:

"If there is substantial migration of gas from the Mount Simon 'A' zone into the Mount Simon 'transition' zone, it is possible that the full 406 pounds per square inch gauge pressure could accumulate at the top of the 'transition zone' which would amount to 0.50 pounds per square inch per foot of depth at the top of the Mount Simon. A gradient of 0.50 pounds per square inch per foot is normally not used in aquifer storage projects."

The commissioner found that above the Mount Simon storage area the Eau Claire strata serve as a cap rock to prevent the leakage of gas to the surface. The Eau Claire strata are about 100 feet above Mount Simon and have a thickness of 25 to 30 feet, the bottom 5 to 10 feet of which is shale, with low enough permeability to prevent gas migration from the storage reservoir. Two separate tests were made in 1967 and 1968 to determine permeability. Water was pumped from below the Eau Claire strata to determine whether the water level above that area would thereby be affected. Some variation in the 1967 level was noticed but none in the 1968 test, as a result of which the commissioner was of the opinion that there was no communication of water across the Eau Claire cap rock. The commissioner noted that the presence of gas could probably be detected by monitoring observation wells. However, if injected gas did appear in water wells, it was possible that explosive mixtures could result.

Any gas which reached the land surface might have an objectionable odor because of impurities picked up by the gas.

Finally, the commissioner was satisfied that storage would be confined to strata 500 feet or more below the surface and "there is no indication that there will be any impairment or pollution of water resources." In his order, the commissioner imposed a requirement that wells be completed in a way which would minimize the possibility of mechanical leakage and directed that existing wells be tested at frequent intervals to determine whether any gas was present. Other specific measures were required to determine routinely any gas leakage and to minimize the possibility of objectionable odor.

No appeal has been taken from the order of the commissioner of conservation granting the permit sought by Minneapolis Gas Company. Appellants concede that the matters determined in that proceeding cannot be collaterally attacked but argue that the issue of whether the company is obliged to condemn the fee is not a matter over which the commissioner had jurisdiction.

The trial court granted the gas company's petition for condemnation of the following estate:

"The exclusive right, privilege and easement in perpetuity to establish, operate and maintain, a gas storage reservoir by the introduction of natural gas or other gases or vapors (all herein referred to as gas) into the geological formations underlying the lands hereinafter described at a depth of five hundred (500) feet or more; to store gas in said reservoir; to retain the possession of gas so stored and the right to withdraw said gas with any water vapor absorbed.

"The owners and occupants of said lands shall have the full ownership, use and enjoyment of the surface of said lands and the subsurface to the depth of five hundred (500) feet from the surface."

Appellants contend that the condemnation of an easement for underground gas storage is for a unique purpose, unprecedented

in Minnesota, and that the legislature did not intend fee owners to be exposed to risks for which they are not compensated. They seek a rule which would give them the option of granting only an easement or requiring the company to take the fee and shift to the condemnor the burden of disposing of surface rights. It is conceded that there is no authority or precedent for such a disposition.

For two reasons, we have concluded that the appellants' contentions are untenable. First, neither the record before the commissioner of conservation nor before the trial court supports the claim that the storage of natural gas presents any substantial danger to the owner of surface rights. Secondly, if the apprehension of the fee owners is well founded, their remedy lies in securing in the condemnation proceedings which are pending damages commensurate with their loss.

As we have indicated, the issues determined by the conservation commissioner are beyond collateral attack. The gas company is therefore authorized to proceed with natural gas storage and has, in fact, injected some 85 million cubic feet of gas as of April 17, 1969. While so-called aquifer reservoirs of this kind are new in Minnesota, they have been used elsewhere for over 40 years and are presently located in some 25 states.[3] Apart from explosions which have occurred in areas drilled with gas and oil wells and unusually susceptible to leakage, no mishaps of any kind which have resulted in personal injuries have been called to our attention. Appellants recite specific sources of danger discussed in the testimony presented to the commissioner. They allude to the 1967 pumping test which showed a change of water level between the strata above and below the Eau Claire dome as proof of permeability in the cap rock. However, the commissioner specifically found that the test did not permit such a conclusion, and there was evidence to support that finding.

---

[3] Winnick, *Underground Gas Storage: Economic Needs and a Proposed Statutory Resolution of Legal Obstacles,* 2 Prospectus 146, note 10.

In addition, appellants argue that the pressure of .5 pound per square inch per foot of depth, which will develop at the peak of the Eau Claire strata, is greater than any heretofore exerted. They do not, however, point to any evidence that such pressure exceeds safe tolerances. It is also argued that the 30 feet of Eau Claire strata contain only 2 to 5 feet of impermeable shale and that the remainder is sandstone and other porous material, whereas the cap rock in aquifer-storage reservoirs elsewhere contains 80 to 400 feet of impermeable shale. Again, there is no support in the record for a claim that the depth of shale is insufficient. The test is actually the degree of impermeability, and the commissioner has found against appellants on this matter. Consequently, we are of the opinion that the conclusions of the commissioner and the conditions imposed for the maintenance and inspection of the reservoir do not permit any valid inference that the easement taken will create a hazardous condition for the fee owners.

Counsel argues that this is a unique problem involving risks which cannot be fully assessed, and that under such circumstances appellants should have the right either to negotiate for an easement or require the gas company to purchase the fee and dispose of the property as best it can. Appellants express concern that proof of the risk is not readily available to them except by assuming the burden and expense of obtaining experts in a somewhat obscure and refined area of geology. Nevertheless, we are of the opinion that by whatever route the facts may be established, the fee owners have an adequate remedy by an application of the usual rules for assessing damages in condemnation proceedings.

Beyond such a holding, any observations we make with respect to rules of evidence is dictum. However, we refer the trial court to the following authorities which may be of some guidance in determining the issues: Gulledge v. Texas Gas Transmission Corp. (Ky. App.) 256 S. W. (2d) 349, 353; Northeastern Gas Transmission Co. v. Tersana Acres, Inc. 144 Conn. 509, 134

A. (2d) 253; Tennessee Gas Transmission Co. v. Maze, 45 N. J. Super. 496, 133 A. (2d) 28; Kamo Elec. Co-op. Inc. v. Cushard (Mo. App.) 416 S. W. (2d) 646, 657; Trunkline Gas Co. v. O'Bryan, 21 Ill. (2d) 95, 171 N. E. (2d) 45; Peoples Gas Light & Coke Co. v. Buckles, 24 Ill. (2d) 520, 182 N. E. (2d) 169; Northern Illinois Gas Co. v. Wienrank, 66 Ill. App. (2d) 60, 213 N. E. (2d) 411, certiorari denied, 385 U. S. 834, 87 S. Ct. 78, 17 L. ed. (2d) 69; 4 Summers, Oil and Gas (Perm. ed.) § 757.1, pocket part, p. 25; 4 Nichols, Eminent Domain (Rev. 3 ed.) §§ 14.241 [1] and 14.246; Annotation, 38 A. L. R. (2d) 788, 802.

Affirmed.

MR. JUSTICE FRANK T. GALLAGHER took no part in the consideration or decision of this case.